UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
===================================================
ANNABELLE THOMPSON, MARC BASIST,
DENNIS KOEN, PAUL SULLIVAN, and
ROBERT DONAGHUE, individually
and on behalf of those similarly situated,
                              Plaintiffs,

v.                                    6:06-CV-00404 (NPM / GJD)


LINVATEC CORPORATION,
CONMED CORPORATION, and
CONMED CORPORATION
SEVERANCE PLAN,
                    Defendants.
===================================================

APPEARANCES                              OF COUNSEL

TORYANSKI LAW GROUP            Kim W. Toryanski, Esq.
Attorney for Plaintiffs
Capitol Park Plaza East
512 West Bannock, P.O. Box 893
Boise, ID 83701


MOUKAWSHER & WALSH, LLC        Thomas G. Moukawsher, Esq.
Attorney for Plaintiffs
21 Oak Street  Suite 209
Hartford, CT 06106


CONMED CORPORATION             Andrew W. Beakman, Esq.
Attorneys for Defendants        Daniel S. Jonas, Esq
525 French Road                 Heather Lynn Cohen, Esq.
Utica, NY 13502


BOND, SCHOENECK & KING, PLLC   Jonathan B. Fellows, Esq.
Attorneys for Defendants        Louis Orbach, Esq
One Lincoln Center
Syracuse, NY 13202-1355

NEAL P. McCURN, Senior U.S. District Court Judge

## MEMORANDUM - DECISION AND ORDER

This class action was filed pursuant to 29 U.S.C. § 1001, et seq., the

Employee Retirement Income Security Act of 1974, as amended ("ERISA"),

alleging denial of severance benefits, breach of fiduciary duty, and violation of

ERISA summary plan description ("SPD") requirements.  Currently before the

court is a motion for summary judgment to dismiss the case in its entirety (Doc.

No. 70) filed by defendants Linvatec Corporation ("Linvatec"), ConMed

Corporation ("ConMed"), and ConMed Corporation Severance Plan (collectively,

"defendants"); and a motion filed by defendants for class decertification, or in the

alternative, modification of the class (Doc. No. 72).  Also before the court is a

motion for summary judgment filed by plaintiffs Annabelle Thompson

("Thompson"), Marc Basist ("Basist"), Dennis Koen ("Koen"), Paul Sullivan

("Sullivan"), and Robert Donaghue ("Donaghue") (collectively, "plaintiffs")

requesting an order granting their ERISA § 502 (a)(1)(B) claim for benefits under

the terms of the Linvatec Severance Plan (Doc. No. 71).  In the interest of judicial

economy, the court addresses the motion for class decertification and the cross

motions for summary judgment herein.  For the reasons stated below, the court

grants defendants' motion to decertify the class, grants defendants' motion for

summary judgment, and denies plaintiffs' motion for summary judgment.

## I.      FACTS AND PROCEDURAL HISTORY

The court presumes familiarity with the facts of the case, as set forth in the

court's MDO issued on May 22, 2007 ("2007 MDO") (Doc. No. 50).  The court

reiterates those facts and any additional facts taken from the parties' numerous

briefs and voluminous discovery materials on the new motions only as necessary

to clarify its findings and to facilitate understanding of the matters at issue here.

In December of 1997, ConMed bought surgical instrument manufacturer

Linvatec from Bristol Myers Squibb ("BMS").  Linvatec maintained an internal

sales division that comprised approximately 160 employees, inclusive of plaintiffs.

During the time that Linvatec was a subsidiary of BMS, its employees were

covered by a severance plan, and all Linvatec employees were provided with a

summary plan description of the severance plan in a BMS booklet called "Your

Benefits." Doc. No. 70-10 at pp. 1-2.[1]   As part of the Stock and Asset Purchase

Agreement between ConMed and BMS, ConMed agreed to maintain benefits and

the BMS severance policy at current levels for covered Linvatec employees for a

continuation period of at least two years from the date of the sale. Doc. No. 70-12,

---

[1]       The page references in this order are those assigned by the court's electronic filing system, CM/ECF.

pp. 2-3.  ConMed agreed to "implement a severance pay formula which is substantially identical to the formula available to BMS employees." Id. at p. 3. ConMed did not issue a new SPD for Linvatec employees, and deposition testimony was heard from the named plaintiffs wherein they stated that they understood that the severance pay formula under ConMed remained substantially identical to the  BMS severance plan, and would be continued for Linvatec employees for at least two years. Doc. No. 70-2 at p. 8 (citing relevant named plaintiff depositions).

In early 2000, Linvatec began laying off employees in its sales division, pursuant to the terms of the BMS employee benefit welfare plan (the "Plan") as updated by the Important Policy Update ("IPU") issued by ConMed, effective March 30, 2000.  Doc. No. 70-12 at p. 5.  Under the terms of the Plan, severance benefits were not paid following the sale of all or part the corporation's business assets if an otherwise eligible employee is offered employment by the acquirer of such assets. Complaint, ¶ 25; Doc. No. 70-12, p. 8.  The IPU updated the maximum amount of severance to be paid, e.g., the maximum weeks of severance pay was decreased to 24 weeks from the former rate of 56 weeks. Id. at p. 5. ConMed asserts that it issued the IPU to bring the Linvatec severance pay in line with that given to ConMed employees.

4

Named plaintiffs are former Linvatec employees and sales representatives for Linvatec products who continued to be employed by Linvatec's sales division until March 31, 2003.  On March 31, 2003, Linvatec outsourced its sales division, notifying its nationwide sales force at a training session in St. Petersburg, Florida. On that date, Linvatec implemented a plan[2] to outsource its sales division and terminate its sales team's employment.  However, each sales representative, upon being told that he or she was being terminated, was offered a contract to work as sales representative with the new manufacturer's representative that had taken over the sales territories.  In other words, Linvatec immediately offered the terminated employees a contract as an independent contractor/sales representative with the now-outsourced sales division.  The manufacturer's representative was obligated to purchase the sample inventory in the field which was, due to the nature of Linvatec's products and sales, valued in the millions of dollars in March of 2003.

The named plaintiffs either refused outright (for various reasons) the offer to work as sales representatives, or in some instances, worked in that capacity

---

[2]     At least one named plaintiff,  Dennis Koen, was aware of Linvatec's intent to outsource its sales force as early as December 2002. Doc. No. 70-2 at p. 13; Doc. No. 70-17, Exh. Q. However, plaintiff Thompson maintains that she had no notice of the impending termination and restructuring of the Linvatec sales force prior to the March 31, 2003 meeting in Florida. Doc. No. 70-24 at p. 17.

before leaving the position.  All filed for severance benefits and all were issued a

letter dated June 9, 2006, denying their claim for severance benefits and advising

them of their right to appeal.  None of the plaintiffs filed an appeal from the denial

of their claims. Doc. No. 70-1, pp. 5 -6.

## II.   DISCUSSION

As a threshold matter, defendants argue that plaintiffs' claims that they were

likely prejudiced by the lack of a summary plan description should not proceed as

a class action. Doc. No. 72-2 at p. 6.  Plaintiffs concede, post discovery, that "the

Class agrees that its Count Three SPD claim may be dismissed." Doc. No. 78 at p.

5.  Accordingly, the court dismisses Count Three of the complaint with prejudice.

### A.   Decertification of the Class

"With respect to class certification requirements, numerosity, commonality,

typicality, and adequacy of representation must be satisfied." Bezio v. Genereal

Electric Co., 655 F. Supp. 2d 162, 164 (N.D.N.Y. 2009) (citing Cent. States Se.

and Sw. Areas Health and Welfare Fund, 504 F.3d 229, 244 (2d Cir.2007)).  In its

2007 MDO granting class certification, the court set forth the Second Circuit's

clarification of the law governing class certification pursuant to Fed. R. Civ. P. 23,

citing In re Initial Public Offering Securities Litigation ("In re IPO"),471 F.3d 24

(2d Cir. 2006) (petition for rehearing denied, 483 F.3d 70 (2d Cir. 2007).  The

6

court reiterates that information here in pertinent part.  The Second Circuit

addressed the heretofore "surprisingly unsettled" issue in this circuit as to what

standards govern a district judge in adjudicating a motion for class certification

under Rule 23.  The Court of Appeals set forth the following standard:

> (1) a district judge may certify a class only after making
> determinations that each of the Rule 23 requirements
> have been met; (2) such determinations can be made only
> if the judge resolves factual disputes relevant to each
> Rule 23 requirement and finds that whatever underlying
> facts are relevant to a particular Rule 23 requirement
> have been established and is persuaded to rule, based on
> the relevant facts and the applicable legal standard, that
> the requirement is met; (3) the obligation to make such
> determinations is not lessened by overlap between a Rule
> 23 requirement and a merits issue, even a merits issue
> that is identical with a Rule 23 requirement; (4) in
> making such determinations, a district judge should not
> assess any aspect of the merits unrelated to a Rule 23
> requirement; and (5) a district judge has ample discretion
> to circumscribe both the extent of the discovery
> concerning Rule 23 requirements and the extent of a
> hearing to determine whether such requirements are met
> in order to assure that a class certification motion does
> not become a pretext for a partial trial of the merits.

In re Initial Public Offering Securities Litigation, 471 F.3d at 41 (2d Cir. 2006).

"Additionally, a class action may be maintained only if it qualifies under at least

one of the categories provided in Rule 23(b)."  In re Visa Check, 280 F.3d 124,

132-33 (2d Cir. 2001).

Currently before the court is defendants' motion to decertify, or in the alternative, to modify the class. In their motion, defendants assert that the court erred in certifying the class, specifically because it considered true the facts in plaintiffs' complaint.  Defendants cite In re IPO for the premise that the court should have resolved factual questions relevant to class certification (Doc. No. 72-2 p.5).  Defendants specifically assert that the court certified the class "based on the assumption that the facts in the complaint are true, rather than based on any findings ...." Doc. No. 72-1, p. 5.  The court notes that it relied heavily on the reasoning set forth in In re IPO, citing the case extensively in its 2007 MDO.[3]  The court also notes that its decision was rendered following a lengthy and contentious motion argument held on January 5, 2007, where both parties were allowed to fully present their arguments on the defendants' motion to dismiss counts two and three of the complaint (Doc. No. 8), plaintiff's motion to certify the class (Doc. No. 23), and defendants' motion for summary judgment (Doc. No. 24).  The court also notes that it cited case law in its 2007 MDO for the premise that "'when deciding a motion to certify a class, the allegations in the complaint are accepted

---

[3]        The court acknowledges that with its decision in In re IPO, the Second Circuit effectively overruled In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124 (2d Cir.2001), and Caridad v. Metro-North Commuter R.R., 191 F.3d 283 (2d Cir.1999), cited by the court in its 2007 MDO. However, the court cited In re Visa Check and Caridad for purposes other than the standard of proof applicable to Rule 23 issues. See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196 (2d Cir. 2008).

8

as true.' <u>Hilton v. Wright</u>, 235 F.R.D. 40, 51 (N.D.N.Y. 2006) (citing <u>Shelter</u>

<u>Realty Corp. v. Allied Maint. Corp.</u>, 574 F.2d 656, 661 n. 15 (2d Cir. 1978)." Doc.

No. 50 at p. 8.   In <u>Shelter Realty Corp.</u>, the court of appeals stated that "we have

previously held that it is proper to accept the complaint allegations as true in a

class certification motion." <u>Id.</u>  Defendants do not argue that <u>Shelter Realty Corp.</u>

is no longer good law.  In addition, the court adhered to the direction of <u>In re IPO</u>,

which held that "[a] district judge is to assess all of the relevant evidence admitted

at the class certification stage and determine whether each Rule 23 requirement

has been met, just as the judge would resolve a dispute about any other threshold

prerequisite for continuing a lawsuit." <u>In re IPO</u>, 471 F.3d at 42.  At the time of

the issuance of its 2007 MDO, with limited facts before it prior to the completion

of full discovery, the court applied the facts it had to the Rule 23 requirements as

set forth in <u>In re IPO</u>.  Therefore, the defendants' argument that the court

considered only the facts alleged in the complaint, with the implication that the

court discounted the facts presented at the motion hearing is, at a minimum,

disingenuous.  Revisiting the transcript of the motion hearing (Doc. No. 49), the

court notes that scant discovery had been done at that stage.  Accordingly, while

both parties competently argued their positions, the burden was on plaintiffs'

counsel to prove that the class met the requirements of Rule 23, and he

persuasively argued that issue.  In the Second Circuit, when a lower court's grant of class certification is challenged, the court of appeals "accord[s] the district court noticeably more deference than when [it] review[s] a denial of class certification." In re Flag Telecom Holdings, Ltd. Securities Litigation, 574 F.3d 29, 34 (2d Cir. 2009).  Defendants have not proffered a convincing argument supporting the premise that In re IPO took away the court's discretion in deciding the class certification.

The court also has discretion to modify an order of certification. "Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 160 (1982).  This court stated in its 2007 MDO that "[a]n order certifying a class 'may be altered or amended before final judgment," citing Fed.R.Civ.P. 23(c)(1)(C).  In addition, "[a] district court also has the discretion to decertify a class by amending the order granting the certification, 'if the court finds that certification should not have been granted or is no longer appropriate.'"[4] (Doc. No. 50 at p. 8).  In fact, "under Rule 23(c)(1), courts are required to reassess their class rulings as the case develops ... [t]he district judge must define, redefine,

---

[4]      Quoting Richards v. FleetBoston Financial Corp., 238 F.R.D. 345 (D.Conn. 2006) (citing  5 Moore's Federal Practice § 23.87 (Matthew Bender 3d ed.)).

subclass, and decertify as appropriate in response to the progression of the case from assertion to facts." <u>Boucher v. Syracuse University</u>, 164 F.3d 113, 118 (2d Cir. 1999) (internal quotation marks omitted).   The court made its previous findings based on the assertions of counsel, both in their moving papers and their oral argument.  However, moving now from assertions (however eloquently argued) to the fruits of extensive discovery currently before it, the court will reassess the issue of class certification.

In plaintiffs' argument to maintain the class, they assert that prior to the March 31, 2003 Florida training seminar, at which the Linvatec sales force was involuntarily terminated, other sales representatives had been offered positions with manufacturers' representatives and refused those positions, and had subsequently been paid severance pay.  Consequently, plaintiffs argue, the defendants were in violation of their own severance policy when they denied severance to the plaintiffs in the instant case.  Defendants argue that these particular instances of severance payouts are not relevant to the case at bar as they took place prior to Linvatec's decision to outsource its entire sales force and instead use the manufacturers' representative model to sell its product line. In addition, defendants state that "as discovery has confirmed, Linvatec did not pay severance to the sales representatives who accepted positions with manufacturer's

representatives in the prior restructurings." Doc. No. 70-2 at p. 21. In other words,

defendants argue that in periods of the restructuring of its sales force prior to

March 31, 2003, the relevant date for the matters before this court, Linvatec did

not pay severance to the sales representatives who accepted positions with

manufacturer's representatives, aka distributors.  Despite plaintiffs' argument to

the contrary, the court concurs, and finds that the record reveals that sales

representatives who were terminated and then accepted employment with

distributors were historically not paid severance.  To be sure, prior to March 31,

2003, a small number of employees were paid severance if they did not accept the

proffered employment, but as this court discusses in more detail below, Linvatec

was well within its rights to change its severance policy, and could have

eliminated it entirely.  Regarding the March 31, 2003 terminations, a sale of assets

occurred when Linvatec outsourced its entire sales division, triggering an

exception to severance as outlined in the Plan.

In its 2007 MDO, the court defined the class as follows: "[t]he class shall

consist of  former Linvatec sales representatives whose employment with Linvatec

was involuntarily terminated in 2003, and who did not receive severance benefits

from the defendants." Id. at p. 24.  Upon review of all the materials before it, the

court grants defendants' motion to clarify, and now finds that the class must

consist of  former Linvatec sales representatives whose employment with Linvatec was involuntarily terminated in 2003, who were not offered employment, and who did not receive severance benefits from the defendants.  Based on the information now before it, specifically Doc. No. 73-2, p. 11[5], the court finds, with discussion to follow, that the class would contain no members.

Key to the case before the court is the issue surrounding which severance plan was in effect at the time of the involuntary terminations relevant to this case. Defendants argue (Doc. No. 72-2, p. 5), and discovery reveals, that the plan in effect at all times relevant to this action consisted of the Plan outlined in the BMS Booklet as modified by the IPU.  As stated above, defendants assert that during the time that Linvatec was a subsidiary of BMS, its employees were covered by a severance plan, and all Linvatec employees were provided with a summary plan description of the severance plan in the BMS booklet entitled "Your Benefits." Defendants state, and submitted documentation and deposition testimony reveals, that under the Stock and Asset Purchase between BMS and ConMed,  ConMed continued that severance plan for at least two years.  The BMS severance policy remained in effect, and on March 30, 2000, ConMed issued the IPU to bring the

---

[5]       This document shows only two employees involuntarily terminated who were paid severance pay.  Cavaliere, who administered the Plan for Linvatec, testified that these two employees, Hawks and Jones, were not given employment offers.

Linvatec severance policy in line with the severance policy covering ConMed employees.

Regarding the Plan, the court notes that the law of this circuit, pursuant to ERISA, is that "an unfunded severance plan is an employee welfare benefit plan ...," and as such, "[s]ince severance benefits are welfare benefits and an employee's interest in a welfare benefit plan is not vested, the employer has no continuing obligation to provide severance benefits; under ERISA, the employer has the right at any time to amend or terminate a severance pay plan." Reichelt v. Emhart Corp., 921 F.2d 425, 430 (2d Cir. 1990) (internal quotations omitted). Consequently, ConMed was within its rights to issue the IPU to amend its severance policy to bring Linvatec employees in line with the severance policy afforded to ConMed employees.  In fact, ConMed could have terminated its severance plan entirely.  The court finds that the severance plan in place at all times relevant to the case at bar consisted of the plan outlined in the BMS Booklet as modified by the IPU.

Defendants assert (and the court concurs, as set forth supra) that pursuant to Plan documents governing the severance plan, the severance benefit was in the nature of an unemployment benefit. Doc. No. 72-1 at p. 6.  Specifically, the IPU states that "'Linvatec is updating its Severance Policy,' and that severance benefits

14

will be paid to terminated employees, 'during a period of adjustment while they seek other employment, subject to certain conditions and guidelines.'" Doc. No. 70-2 at p. 20.  The court also concurs with the defendants' assertions that the severance benefit set forth in the Plan documents was intended to assist terminated employees while they sought other employment.

The court now has before it documentation and sworn testimony revealing, inter alia, that "[s]eventy of the seventy five sales representatives terminated in March 2003 accepted offers to work with the manufacturer's representatives," (Doc. No. 70-10 at p. 13),  and the majority were still working in that capacity in 2008 (Doc. NO. 70-10 at p. 14).   The court also notes testimony that almost half of the sales force in this particular industry sells on a commission only basis (Doc. No. 70-24 at p. 2), the same basis as the positions immediately offered to the former Linvatec sales force when they were involuntarily terminated; and that certain named plaintiffs were, at the time the depositions were taken,[6] were employed or had been employed on the same basis for different companies, despite turning down employment on the same basis with the Linvatec manufacturers' representatives.  In particular, named plaintiff Thompson testified that after her termination by Linvatec, she was employed selling medical products

---

[6]        Information current as of the date of the individual plaintiff's deposition.

on a strict commission basis, with no benefits, and did not think the offer for that position was "illusory," (Doc. No. 70-24 at p. 23) a term used to define the employment offers by the Linvatec manufacturer's representatives in the complaint in this action. Doc. No. 1 at p. 9.  In its 2007 MDO, the court stated that "there is a question of whether the independent contractor positions offered to the newly terminated Linvatec sales force are considered <u>bona fide</u> job offers pursuant to the exemption in the severance policy." Doc. No. 50 at pp. 31-32.  Plaintiffs concur that "the central issue of this case [is] whether Class members received offers of employment disqualifying them from severance benefits." Doc. No. 76 at p. 23.  The court must now make a determination regarding whether the contracts were offers of employment for the purpose of interpreting the severance policy, both on the issue of class decertification, and subsequently, on the cross motions for summary judgment.  Now having before it the benefit of knowing, <u>inter</u> <u>alia</u>, what SPD was in effect at all times relevant to the case at bar and the exceptions for paying severance set forth therein, along with testimony that it is common in this particular industry for sales employment on a commission only basis, and that certain named plaintiffs did not feel that their subsequent employment on a sales commission only basis was illusory, the court finds that the proffered contracts were offers of employment.  Accordingly, the Linvatec sales people who

immediately accepted those offers were not eligible for severance pay as they were never unemployed, and did not experience a period of adjustment while they sought other employment.  For this reason, those individuals must be eliminated from the class.

After a thorough and painstaking reading of the materials before it, the court finds that the plaintiffs do not satisfy the numerosity requirements for class certification, set forth supra.  As this court previously acknowledged, the named plaintiffs purported to represent any and all former Linvatec sales force employees who took the proffered contract and subsequently left those positions [Basist and Donaghue]; those who rejected the contract outright and immediately filed for severance pay [Thompson]; those who had the offer withdrawn [Sullivan]; and those who rejected the contract but opted instead for retirement [Koen].  However, discovery reveals that a very large number of the former Linvatec sales force accepted the proffered contract and may in fact remain on the job to this day. Despite plaintiffs' claims that the group that accepted the contract are also eligible for severance payments, that segment of the former Linvatec sales force is not represented by the named plaintiffs, and plaintiffs do not explain why that segment of the putative class has no representation.  In addition, as discussed supra, historically, terminated Linvatec sales representatives who have accepted

17

employment with a distributor have not been paid severance. Doc. No 70-10 at pp.

8-9.  Thus, the court is left to ponder whether the named plaintiffs are fanning the

flames of a controversy that does not in fact exist beyond the interests of these five

former Linvatec employees.  Discovery has revealed, <u>inter alia</u>, that the named

plaintiffs present a plethora of reasons why they did not accept the new positions

when most of the Linvatec sales people did in fact accept the proffered contract.

For instance, in the case of Ms. Thompson, she was presented a copy of a

proposed contract between her and manufacturer's distributor Northwest Surgical,

where she would be working for Scott Hanson.  Thompson's sworn testimony

reveals that despite the fact that she had only seen Hanson periodically in the

approximately two years he had been employed by Linvatec, she had reached a

conclusion that he was not a trustworthy person.  When he handed her the

proposal, Thompson states that she gave her proposed sales contract back to

Hanson after a half hour discussion with him in March 2003, and followed up with

a phone call stating that she would not be signing the contract. When she returned

home from the Florida sales meeting, Thompson met with an attorney and "started

this severance issue." Doc. No. 70-24 pp. 22.  Donahue reviewed the contract, and

upon the advice of his attorney, who found that the contractual obligations set

forth by the manufacturer's representative to be "onerous" (Doc. No. 85-3 at p. 6),

along with his own feelings that he was being set up to fail by the manufacturer's representative, Donahue refused to sign the proffered contract. Id. In sum, the court finds that the majority of the former Linvatec sales force accepted offers from the manufacturer's representatives, and were not without employment nor were they attempting to seek employment as defined by the terms of the BMS booklet and the IPU. Consequently, according to the terms of the severance policy in effect at the time, the group that accepted employment from the manufacturer's representatives on March 31, 2003 was not entitled to severance pay. The depositions of the named plaintiffs reveal in their own words that their personal reasons for refusing the offers from the manufacturer's representatives are varied and subjective. The court suggests that this action might well be a case of the tail wagging the dog, with one or more disgruntled former employees seeking to join other former employees who quite possibly have, continuing the canine metaphor, no dog in this fight. In fact, defendants point out that "[t]here is no evidence that any of the terminated sales representatives who accepted the offers of the manufacturer's representatives and have continued in such employment even asked Linvatec for severance, much less filed any formal claim for such benefits." Doc. No. 72-1 at p. 10.

What the court ultimately determines from the depositions and other

submitted materials is that the five named defendants alone cannot satisfy the requirements of class certification, as even they do not fall under the definition of a class member as the court has clarified and defined it.  Accordingly, by clarifying the scope of the class based on the new evidence before it, the court finds that it is now compelled to grant  defendants' motion to decertify the class.

   **B.**     **Cross Motions for Summary Judgment**

   Both plaintiffs and defendants have moved for summary judgment in this matter.  A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  See also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82 (2d Cir. 2004).  "[I]n assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought[.]"  See Security Ins., 391 F.3d at 83, citing Anderson V. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505 (1986). "Only when reasonable minds could not differ as to the import of the evidence is

20

summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.),

citing Anderson, 477 U.S. at 250-51.

While the initial burden of demonstrating the absence of a genuine issue of

material fact falls upon the moving party, once that burden is met, the non-moving

party must "set forth specific facts showing that there is a genuine issue for trial,"

see Koch v. Town of Brattleboro, Vermont, 287 F.3d 162, 165 (2d Cir. 2002),

(citing Fed. R. Civ. P. 56(c)), by a showing sufficient to establish the existence of

every element essential to the party's case, and on which that party will bear the

burden of proof at trial, see Peck v. Public Serv. Mut. Ins. Co., 326 F.3d 330, 337

(2d Cir. 2003), cert. denied, 124 S.Ct. 540 (2003).

In an ERISA case such as the one before the court, "[p]lan trustees are

entitled to deference when the terms of the plan afford them discretionary

authority over benefits." Gallo v. Madera, 136 F.3d 326 (2d Cir. 1998) (citing

Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989). The BMS Plan

booklet relevant to the case at bar contained this so-called Firestone language,

stating that "[t]he Plan Administrator has the discretionary authority and

responsibility for, among other things, determining eligibility for benefits and

construing and interpreting the terms of a plan." Doc. No. 70-2 at p. 22. The

Supreme Court recently revisited and reiterated the reasoning behind the Firestone

deference standard:

> Congress enacted ERISA to ensure that employees
> would receive the benefits they had earned, but Congress
> did not require employers to establish benefit plans in the
> first place.  We have therefore recognized that ERISA
> represents a careful balancing between ensuring fair and
> prompt enforcement of rights under a plan and the
> encouragement of the creation of such plans. Congress
> sought to create a system that is not so complex that
> administrative costs, or litigation expenses, unduly
> discourage employers from offering ERISA plans in the
> first place. ERISA induces employers to offer benefits by
> assuring a predictable set of liabilities, under uniform
> standards of primary conduct and a uniform regime of
> ultimate remedial orders and awards when a violation
> has occurred.
>
> Firestone deference protects these interests and, by
> permitting an employer to grant primary interpretive
> authority over an ERISA plan to the plan administrator,
> preserves the careful balancing on which ERISA is
> based. Deference promotes efficiency by encouraging
> resolution of benefits disputes through internal
> administrative proceedings rather than costly litigation. It
> also promotes predictability, as an employer can rely on
> the expertise of the plan administrator rather than worry
> about unexpected and inaccurate plan interpretations that
> might result from de novo judicial review.

Conkright v. Frommert, --- S.Ct. ----, 2010 WL 1558979 at * 7-8 (2010) (internal
quotations and citations omitted).

In the case at bar, Linvatec was not required by law to maintain a severance

plan for its employees, but it did in fact have a severance plan in its overall benefit

plan offered to its employees.  When ConMed modified the severance plan for

Linvatec  employees to be more in line with the existing severance plan for its

ConMed employees, ConMed would have been within its rights to eliminate the

plan altogether, yet it did not.  The court also notes that ConMed adhered to the

relevant language in the Plan and the IPU,  to wit,  "[n]o severance will be payable

if you leave the company prior to a scheduled termination date, or if your service

to the company is terminated for any of the following reasons: ... the sale of all or

part of the company's business assets if you are offered employment by the

acquirer of such assets." BMS Plan booklet at SP-4; Doc. No. 71-16 at p. 3.

Pursuant to that unambiguous language, ConMed sold part of the company's

business assets, i.e., millions of dollars' worth of equipment used in the field to

demonstrate Linvatec's product line, and immediately offered employment to the

majority of the terminated Linvatec sales staff, and specifically, to all of the named

plaintiffs.  For all the reasons set forth supra, and affording defendants the

deference demanded by relevant and binding case law on the matter, the court

finds that the named defendants were not eligible for severance benefits based on

the facts of this case, and while defendants have met their burden of demonstrating

the absence of any genuine issue of material fact, plaintiffs have not sufficiently

set forth specific facts showing that there is a genuine issue for trial.

In addition, for the reasons set forth above, the court finds plaintiffs' argument in their motion for summary judgment (that the class members were not given employment offers), to be unavailing.  Plaintiffs cite the court's consideration of <u>Darden</u>[7] in its May 2007 MDO for the premise that plaintiffs were not offered employment, but were instead offered independent contractor status after they were terminated from their Linvatec sales positions.  The court looks again to <u>Darden</u>, specifically the section quoted by plaintiffs that states "[s]ince the common-law test contains no shorthand formula or magic phrase that can be applied to find the answer, all of the incidents of the relationship must be assessed with no one factor being decisive."  In weighing the proffered evidence in its entirety, and considering this particular industry in particular, the court finds that the named plaintiffs were in fact offered employment with the Linvatec manufacturer's representatives.

Based on the facts before it, the court finds that pursuant to the severance policy in effect at the time of the plaintiffs' termination, there was a sale of some of Linvatec's assets, and the named plaintiffs were offered employment with the purchaser of those assets, i.e., the distributors who contracted with Linvatec to sell its goods.   The two employees who were not offered employment were in fact

---

[7]        <u>Nationwide v. Darden</u>, 503 U.S. 318, 324 (1992).

24

paid severance benefits pursuant to the Plan.  Affording deference to the Plan

administrator, as the court is required to do in a line of controlling case law, this

court finds that there is no genuine issue of material fact present that would

preclude this court from granting summary judgment on the two remaining counts

in the complaint.  Accordingly, the court grants defendants' motion for summary

judgment in its entirety.

Assuming, arguendo, that plaintiffs appeal the court's dismissal of this case

on summary judgment, the court will discuss additional grounds to justify

dismissal of the case at bar.  In its previous MDO, the court found that the issue of

whether the plaintiffs exhausted their administrative remedies prior to filing the

instant action hinged on the SPD, if any, that was in effect at the time. Doc. No. 50

at p. 9.  The court has found, supra, that the plan in effect at the time relevant to

this action was the BMS Plan, as revised by the IPU, which unequivocally set

forth the administrative remedies available to the employee. Doc. No. 70-11 at p.

16.  It is well-settled law that ERISA plan participants are required to exhaust

administrative remedies. Klotz v. Xerox Corp., 332 Fed.Appx. 668, 669 (2d Cir.

2009) (affirming finding of district court that plaintiff failed to exhaust

administrative remedies because she did not utilize the second level of the

company's appeals process).  Accordingly, considering the pertinent information

25

that an SPD plan outlining administrative procedures was in effect, together with the information that the named plaintiffs utilized their administrative remedies up to a point, but then failed to appeal the unfavorable decision regarding severance pay, the court finds that summary judgment could also be granted on this basis.

Plaintiffs have filed a cross motion for summary judgment. Doc. No. 71. Considering the court's findings set forth supra, e.g., that the severance policy was that outlined in the BMS Plan and the IPU, a sale of assets occurred, and the purchaser(s) of those assets offered employment to the terminated Linvatec sales staff, plaintiffs' motion is denied as moot.

## III.   CONCLUSION

For the reasons set forth supra, the court hereby GRANTS the defendants' motion to decertify the class.  Defendants' motion for summary judgment is GRANTED in its entirety.  Plaintiffs' motion for summary judgment is DENIED. The Clerk is instructed to close this case.

SO ORDERED.

June 22, 2010

_____
Neal P. McCurn
Senior  U.S. District Judge

26